May it please the Court, we submit that in the decision below, there are basically four fundamental and reversible errors, all of which stem, in large part, from the erroneous conclusion of law by the Court that a sandal is not a shoe. The Court reached this conclusion so it's fine. It was never argued by the government, below, or in this Court. And as a result of that, we have these four errors that follow. The first error was the Court disregarded additional U.S. Chapter Note 2 to Chapter 64, which defines the term in issue, tennis shoes, basketball shoes, training shoes, gym shoes, and the like, as athletic footwear. Secondly, the Court substituted a rule of construction, the justum generis, in lieu of the statutory definition, which was specifically enacted by Congress to define the term. The third error was that even if... The second error ends on the first day of the year. That's true. It's 2 for 1. So it's really 1 and 1A if you wanted to do it. Indeed. And then the next error is in the application. Most of the third error is the one you're doing now. Yeah. The third error is the misapplication of the doctrine of the justum generis to the facts in this case. And finally, the fourth error is the finding that the imported merchandise was not a training shoe in the face of uncontradicted evidence to the fact that it is a training shoe. That's the only way I can conclude that the Court came to that conclusion. He looked at the provision and came to the conclusion that training shoe, in order to be one, must be a shoe. And if you're not a shoe, you can't be a training shoe. But otherwise, the facts establish that this article, whatever it is, if it's not a shoe, is used for training and is a training shoe. Let's assume the purpose of the argument is that a basketball shoe is a shoe, and a sandal is a shoe, and a flip-flop is a shoe. Do you know what a flip-flop is? Yes, I do. Is the sandal closer to the basketball shoe or to the flip-flop? This sandal is closer to the basketball shoe by reason of its construction. A flip-flop is a flimsy piece of rubber that could not be used in athletic activity. The soles of each... Someday you may represent the flip-flop folks. Have you seen your kids running around in flip-flops? They do all sorts of athletic things in flip-flops. In fact, they used to ride rafts up and down in Colorado in flip-flops until your client came along. Actually, the client came along because the flip-flop fell off. That's right. And they were shoeless. But the reason they fell off is they were not an athletic shoe. They were a casual shoe that was being used in an athletic purpose. And that's why Mark... What about ballets or things that ballerinas wear? A ballerina's... Is that closer to a basketball shoe or to a sandal? I think the ballerina shoe is less a toe shoe. It's got the metal toe in and it's got the straps around the ankle. It allows them to stand up on their foot. That's a shoe, no question about it. Without a doubt. So, I guess the point... If I understand the question, I will try my best to answer it. The sandal is far closer to a basketball shoe than a ballet slipper. The way I sort of understood what the judge was saying at the end when he said, Well, it's not a shoe. What he meant was, it's not a shoe the way the exemplars in the note are shoes. He was saying, well, there are all kinds of shoes if you look in the dictionary. My goodness, slippers, they're shoes. All kinds of things. Basically, anything that goes on the plate is a shoe. Well, I don't think that's what the judge said. I think he said flat, a sandal cannot be a shoe. And once you come to that conclusion, it's pretty tough. If I were to give him the benefit of the doubt, I'd say, well, that's kind of sloppy language. But basically, he was doing a Houston Generous analysis saying, there's a whole category of shoes. And in that whole panorama of shoes, I think that the sandals are not, they don't meet the test of the exemplars that are shoes in the notes you're trying to get into. Well, that's an interpretation. I understand. But that shouldn't. I'll give you your point. I mean, I don't know that I've built my entire case around the fact that the trial judge said that your sandals aren't shoes. Oh, most certainly we're not. We're just saying that if you look at that conclusion, it poisons the rest of the conclusions in the case. Right. I'm just suggesting that there's a way of reading the opinion to remove the poison and then come back to the fundamental issue, which is, was the interpretation of the note two correct? That is to say that your theory is too broad. It brings in too much of that bunch of shoes. And under your theory, the flip-flop gets classified in the same place as your sandals do. And the ballet slippers get classified in the same place as your sandals do. And during there, anything that goes on the flip gets in. Because under your interpretation, there's no real requirement of athleticism associated with the thing in order to get it in the note two. Your Honor, if that's the impression you're getting from my argument, that's not the argument. The argument is, you don't get into athletic shoes unless you have something that is designed and constructed and commercially meant to be an athletic shoe, bought, sold, or marketed as such. So I would not— Well, your trial got you. I mean, when they gave you the full trial on whether or not, based on the customs ruling, based on character disorder, these sandals were not used in an athletic endeavor, and you went to trial in Calvary, New York, and you slammed it up. You won on that day. It absolutely is something to be used for that purpose. Yes. And, well, of course, I think you've articulated at the outset what we really are saying is our client argument, that the statutory note is what drives this case, and it had to be followed. And if you don't—if you lose on that, then we're going to go to Houston, Gen. for sure, aren't we? Yep, absolutely. Right. And if you go there, we're saying that the sandals, and we proved in the trial, have the characteristics and purposes of all of the other articles, which is mainly the uniting factor in all of them is that they're athletic footwear. And yet— So you're saying that every type of footwear that can be used in athletics would be covered? I would not make that argument. That's too easy. It requires much, much more. It has to be shown that the article is designed for athletic purposes, that it contains features, such as the tennis court sandal, that make them designed for athletic use. For any athletic use? Yes. So you need a team of footwear for playing basketball? Absolutely. Do you think, though, it's not designed for that particular purpose? That's right. But it's designed for athletic use. Well, what the judge did against you was to say, well, when I look at the example, they've all got structure that restrains and detains the toes, and they've got structure that retains and detains the heels. And your intent is to have those two features. I would disagree with that, Your Honor. That's what the whole patent was about. And there's endless testimony to the effect that the shoe is— If I was playing basketball in your client's shoe, and some big guy stomped my toe, is there anything between his foot and my toe that he does to stop me? No, Your Honor. So I really take a whack. Now, in a basketball shoe, you might not find in the front a layer of rubber or maybe a few other things between his foot and my toe. Right. Is there a difference? Certainly there's a difference. It's not designed as a basketball shoe. It could be used to play basketball because— The reason I raise it, as I understood how the trial judge applied the use of the generous test, was he said, I'm going to look for what I think are the essential characteristics and qualifications of the court. Are four examples of it, I think? And he said, what do they all have in common? They all have in common one other thing, that they restrain the toe, and they restrain the heel. And the Teva sports sample does that. There is testimony from all of the plaintiff's witnesses that the shoe is designed. You end up with a custom-made shoe. These straps, and that's what the whole patent is about. The straps on that shoe, and we demonstrated it on my foot at trial, where Witness McGuire, and that's in the appendix to the record, showed how the straps are put on the foot so that you cannot move your foot in that shoe. That coupled with the sole itself, there's no slipping. So it is that design that makes it an athletic shoe. It doesn't move around. And that's how they can jump around on boats, how they can go jogging through mountains and creeks. There's testimony where, in one of these extreme events, where after three days... I'm sure it would, but they do run in them. They've run marathons in them. As one of the witnesses said, who trains in them regularly, if I'm doing a lot of land exercise, and it's an event with land and water, but most of it's land, I'm going to use traditional jogging shoes. But if I'm in an event, and some of these events involve that, where you're bouncing around beaches and creeks and mountains, where there's a lot of water, most of the time I'm going to use the toe sandals. Yes, absolutely. They're still open, but they're much more closed. Anytime you cover the toes, you're going to get some additional protection, to be sure. Mr. Gill, you're into your rebuttal time now. Do you want to save the rest? I would, Your Honor. Thank you. We'll hear from the government then. Ms. Powell? May it please the Court. The trial court's decision should be applied for several reasons. First, we believe that the trial court properly applied the justem generis doctrine to interpret the statute at issue. What the trial court did was essentially look at the language of the statute and determined that it fell squarely within the justem generis rule. It has a number of exemplars, followed by a general word or phrase. But you don't get to that unless you disagree with your adversary on the meaning of note two. Yes, we definitely disagree. The government's interpretation, our interpretation of the note, the note actually, let me start with the purpose of the note. The purpose of the note is to alleviate the need for customs to do a search and inquiry as to whether footwear that comes in is used for certain athletic purposes. Specifically, the purposes that are being in the title. A basketball shoe doesn't lose the comfort of a basketball shoe because Woody Allen likes to wear it as a tuxedo. True. And we think, we believe that that is the purpose of the note. So therefore, the note, you read the, you utilize the justem generis interpretation along with the note. And in this case, the court's judgment didn't run a tile of note because the court didn't take into account whether the sneakers, I mean the sandals were used for a particular sport or not. Another reason why we disagree with Appellate's Why shouldn't it be a functionality test? Is it a functionality test? That you can only use it for athletic purposes and certain athletic purposes? So tennis shoes and basketball shoes and gym shoes, training shoes, define a particular function? It's a functionality test, but I think the title requires something else. As the court had noted previously, if it was just functionality limited to athletic purposes, then any kind of shoe where one claims they use it for an athletic purpose would fall into that category. The provision, yes, it's function. It's used as a gym shoe or training shoe or basketball shoe, but it also has to, for our purposes, have some sort of resemblance. It has to have an enclosed upper. How helpful is that phrase in note 2 saying whether or not the principal use is for such athletic games and purposes? Is that a restriction on the language? I think the effect of that language is essentially to assist customers when the merchandise comes in so that it doesn't have to do a certain inquiry. I'm not sure if it's a restriction, more or less instruction. You're saying it's a reason for the note. They put the note in so that people at customs would know that they don't have to ask whether the basketball shoe was going to be used by the Boston Celtics or the Marietta Clinic. True. I think that's what you told me you had in the draft. Yes. That actually, to dovetail on that, if the appellant's interpretation of the note was correct, then they'd run. Everything under the sun. Everything under the sun. They wouldn't use it in any athletic endeavor. Right. You would also have to go back and still do some sort of test. According to them, if it's athletic footwear, it has to be designed, constructed, marked, and as such. If you accept the appellant's interpretation, you sort of make the note take the teeth out of the note. You make the customs go back and do the same sort of inquiry that the note says that customs doesn't have to do. So that's your argument as to why the trial court didn't care by stopping its analysis prior to Act No. 2 and instead went to use the general, right? Yes. Now, you've heard your adversary argue that if you're right, that he still wins, his client still wins, because your adversary believes that the trial court didn't apply the use of generis test correctly. The way I understand the appellant's argument is that the sandals are adjusted in generis because they are worn or function as athletic footwear. Again, I think if you look at the note. What he was saying was he concedes that there's no covering of the toe and he concedes that there's no covering of the heel and he says so what? From a use of generis point of view, so what? Because the evidence shows that he is just as much an athletic shoe as a basketball shoe. In fact, he thinks he can play basketball in his sandals. Our position is that it's actually not a similar way. If you look at the exemplars, yes, you can do athletic activities in them, but it's much more. That's not the spot on the issue. If you look at them, the exemplars do have a covered toe, a covered heel, a covered side. So, yes, the imported sandals are going to share some characteristics with the exemplars, but those characteristics aren't dispositive. The essential characteristic, our position is the enclosed protective upper. Fundamentally, according to Peterson, which shows how far disconnected the court of international trade was from reality here, is that the trial judge says the sandal is not a shoe, right? Yes. We know that a sandal is a shoe, don't we? Yes, we do. So how are we going to deal with a trial court who seems to have some of the decision on the ground that the sandal, although, is not a shoe? Although the trial court didn't explain its analysis, it did, in its opinion, include a signal right after its conclusion that says, essentially, a sandal is not a shoe, and those references actually include references to trial exhibits, certain of them, which were pictures of the exemplars, and the court then references the government's witnesses' trial testimony and then says, compare that with the sandals. So, essentially, yes, the court said a sandal is not a shoe, but the way the government reads it, when it looks at this additional citation here, it's saying, and look, there's a comparison. All these shoes have covered toes and heels. Compare that with the sandals. They are open shoes. That's how we interpret the court's judgment on opening. If we have all those exhibits that are cited on page 9 of the trial court's opinion, where it said, again, there can be little doubt that the term shoe doesn't cover the teeth, do we have those things in the record here? I'm not sure about that. I assume we have the plaintiff's exhibits 1, 2, and 3, and the defendant's exhibits N, because I know that the whole trial record was forwarded to the court. We've got exhibit 1, 2, and 3, and the defendant's N, we have. I think you should have them, with everything from the trial court to the court. With respect to the citation to New York trial 2, page 13 to 23, that's actually in the joint appendix. It's the Hamel testimony. And if you look at the page numbers that are actually on the top right, that's what it's actually citing to, 13 through 23. What you don't have- What does that say? Do you have a recollection of what the assumptions are of page 13 to 23 are? Sure. In sum, Dr. Hamel testified. First he explained what the function of the particular shoes were. Then he went through and differentiated the different types of items that are found on the shoe, a heel counter, a toe pad, ridge around the outside, and compared that to the sandals, which didn't have those kind of components, and concluded what the effect of not having those components were. And let me back up. With respect to defendants exhibit B1, 2, 3, and 4, you should have those, too, if they're part of the court record. No, I don't- No, you're saying we have- I'm not sure the physical exhibits have been transferred. Sometimes. I assume that everything was transferred. I'm not sure. No, we usually- We only just get, as a regular matter, we just get the appendix material, unless something is specifically sent by one of the parties, I think. You can ask for it if you need it. But I don't think we have physical exhibits yet. I'm sorry, I wasn't aware of that. I thought everything was transferred. Unless I've missed anything here. If you need that material, I'm happy to reach for our office to forward it to you. Thank you. No, that's fine. Thank you. Okay. Thank you. Your Honor, you have, I guess, three and a half minutes of your rebuttal. Thank you, Your Honor. Just to get back to the note, which is at the heart of this case, as far as we can see. Additional note two does three things. Not that the government would have you believe it does one thing. It does three things. It defines the term tennis shoes, basketball shoes, etc. And calls them athletic footwear. It excludes from that definition certain kinds of sports footwear in note one. The cleated type particles and things of that nature. And finally, it relaxes the principle use requirement. It does all three of those things. To accept the government's interpretation is to write out of the statute the first thing that it does. And why did Congress do that? Because it was handed a six digit term in the harmonized system, the international system. And it was not satisfied with leaving it alone. So Congress said, no, we're going to give you the definition of what that term means. And what that term means is A, B, C, and D. And the articles like it are athletic footwear. If it's athletic footwear, it goes into that box. If it's not, it doesn't. And I... If it was a line item at the same level. The levels are very critical. So if it was a line item at the same level, then you'd have to decide which one's more specific. And that's what rule three is, general rule three is all about. But in this case, we don't get past general rule of interpretation one. If a chapter one defines something and puts it into that box, that's the end of the discussion. And that's what Congress did in this case. It didn't leave it to chance. It said, we're going to say that that provision covers all athletic footwear. It's as simple as that. That's what they did. I don't think so, because you'd have to still establish the use and the design for use as athletic footwear. And that's not the case with the galosh. Any fugitive use, you could fugitively use any shoe. That's right. So the real point of the case, I think, is at the heart of this thing. No matter what all else is said, we had a disregard of a statute that's clear on its face by the trial court, compounded by a finding that the sale is not a shoe. And you have to look at what that did to his thinking. He looks at the provision. He sees shoe, shoe, shoe, and shoe. Congress could not have meant something that's not a shoe to go in there. Congress said what it said. And the job of the courts is to give full force of effect.  Thank you, Your Honor. Thank you, Mr. Gill. The case is submitted, and that concludes this morning's hearing. All rise.